## Case No. 18,260.

### CHARGE TO GRAND JURY — CIVIL RIGHTS ACT.

### [21 Int. Rev. Rec. 173.]

#### Circuit Court, W. D. Tennessee. March, 1875.

##### CONSTITUTIONAL LAW—CIVIL RIGHTS OF COLORED PEOPLE — THIRTEENTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

[1. The thirteenth amendment to the constitution of the United States simply abolished slavery. It gave the freedman no right of protection from the federal government superior to that of his white fellow citizens, and no exemption from the power of state control which might be exercised against others. It gave congress no more authority to enact that he should have the right to vote, to testify, to make contracts, to hold real estate, exercise trade, attend public school, or any other matter within the limits of a state, than it does to enact the same thing in reference to white men.]

[2. The provision of the fourteenth amendment, that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;" prohibits the action of the state alone; it gave congress no power to legislate against the wrongs and personal violence of citizens.]

[3. The privileges and immunities which this clause forbids the states to abridge are only that limited class which depend immediately upon the constitution of the United States, such as the right to pass from state to state and to the national capital, to protection upon the high seas and in foreign countries, and the like.]

[4. Congress has no authority, under the thirteenth and fourteenth amendments, or otherwise, to declare it a crime for any individuals to deny to negroes the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of the theaters and inns of a state.]

EMMONS, Circuit Judge (charging grand jury). It is to be regretted that a question of such exceptional importance, and one which is producing so much excitement, should come before the court in this form. At an early day, however, and during the term, we are compelled by law to decide the matter you lay before us. The severe penalties imposed by this law upon prosecuting attorneys and other officials will, we are advised, be attempted to be enforced should the grand jury fail to indict, in the assumption that their action will be controlled by such officers unless the court acts. Every consideration makes it a duty to answer your question at once. You ask whether it is a crime for which you have a right to find an indictment that a negro has been denied "the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of the theaters and inns" of the state. Such a denial is not an offense over which congress can give this court jurisdiction. Those are matters which the state government alone controls. The parties who think themselves aggrieved can bring civil action in this court at once. Any decision we may then make can be reviewed by the supreme court. In ordinary circumstances, this brief reply is all which we should make. It is all which, as a very general rule, the proprieties of such occasions authorize. But such are the exceptional conditions which attend these complaints before you, and such the excited condition of those classes whom the law was intended to affect, that after much hesitation we have yielded to an earnest request to state, in a simple and untechnical form, the reason upon which our advice rests. To do this successfully, in haste and without preparation, is still more difficult for a judge than to treat the matter technically, when addressing the judicial and professional mind.

Until the three recent amendments to the national constitution, which abolished slavery and attempted to protect the civil and political rights of the freedmen, all parties conceded that the federal government had no power whatever to restrain such an offense as this. The punishment of murder, arson, assaults and batteries, trespasses, frauds, injuries to reputation, of obstructions to the right of attending church, public schools, theaters, and forcing the right of being accommodated in inns, and by common carriers within the state, were matters not only not granted to the general government, but in the constitution itself expressly reserved to the states. The vast mass of civil and political rights included in the compendious phrase, the right of "life, liberty and the pursuit of happiness," rested entirely under state protection. To this familiar and unquestioned truism, there was universal assent then and is now. The only question presented for judicial determination is, have these amendments completely revolutionized the whole character of our government? Because it is entirely evident that, if congress has the power of regulating the theater and "other places of amusement" in Memphis and other cities of the Union, this necessarily involves the power of protecting the more sacred and important rights of the colored citizen.

The thirteenth amendment abolished slavery only; it did no more. It gave the freedman no right of protection from the federal government superior to that of his white fellow citizens, and no exemption from the power of state control which might be exercised against others. The right of legislation secured to congress in the amendment was that only of creating penalties for a violation of its provisions, and providing securities against the re-establishment of slavery, either generally or in particular instances. It accords no more authority to enact that he should have the right to vote, to testify, to make contracts, to hold real estate, exercise trade, attend public schools, or any other matter or thing within the limits of a state, than it does to enact the same thing in reference to white men. The utmost effect of this great provision in our constitution was to make the colored man a citizen, equal before the laws with the race which had enslaved him. For this purpose the fourteenth amendment was by no means necessary. So far as the control of congress is concerned, the states were still free to legislate in reference to what persons should attend theaters, be accommodated at inns, or be transported by common carriers within the states. As an illustration of unquestioned local state power anterior to this amendment, we suggest a fact in the history of the state of Michigan. By the voice of the people, it three times denied the colored race, though taxed, the right of voting. The supreme court of that state sustained as lawful the action of a steamboat master excluding a colored person from the steamer's cabin, compelling him to take passage on the deck. These judges were high-toned gentlemen, of far more than ordinary legal culture and ability, and elected to their places by a then strongly predominant antislavery party in the state. They sustained the action of the carrier, as a wholesome police regulation, calculated, in view of our American education and prejudices, to secure peace and harmony in that department of commerce and business under his control. It was deemed injudicious that the law should interfere with his action. The state legislature, also overwhelmingly antislavery in sentiment, might have changed this rule, but refused to do so. Against this action, political and judicial, a large and influential portion of the people earnestly struggled and protested. But all understood, from the numerous rulings of the supreme court, there was no power in congress to interfere with the decision of the judges and the people of the state. Like conditions, in a greater or less degree, characterized nearly every free state in the Union. A nearly similar judgment, arising upon facts since the amendment, has recently been pronounced by the learned judge of the superior court of

Cleveland, Ohio, in which he ruled that the manager of a theater might lawfully exclude from the dress-circle a colored person of ever so much respectability. It would seem to be clear that the abolition of slavery placed the negro in the former slave states just where he had before stood in the free states. What congress could not do in reference to a free negro in a Northern state, where slavery never existed, before the abolition of slavery, it could not afterwards do in regard to one living in the South. We conclude with confidence that the thirteenth amendment did not authorize congress to interfere with the private and internal regulations of theater managers, hotel keepers, or common carriers within the state, in reference to colored persons, any more than it did in regard to their white fellow citizens.

It will simplify the subject, before considering the fourteenth amendment, to say that the clauses forbidding the "states to deprive any person of life, liberty, or property, without due process of law, or deny to any person the equal protection of the laws," have no application to this subject. They are intended solely to prevent the arbitrary transfer of property from citizen to citizen without legal adjudication or process, and to prevent the establishment of tribunals for one class of persons varying from those which determine the rights of all. These inhibitions, too, beyond all controversy, are aimed at the action of the state only, and have no reference to individuals. The only provision of the fourteenth amendment which affects this question is that which provides that "no state shall make or enforce any law which shall abridge the privileges and immunities of the citizens of the United States." It would be as useless as it would be improper, in view of the authoritative judgment of the court of last resort, to do more than to explain just what it announces. In what are known as the Slaughterhouse Cases, 16 Wall. [83 U. S.] 394, two points were established: First, that this clause prohibited the action of the state alone, and gave congress no power to legislate against the wrongs and personal violence of the citizen; second, that the privileges and immunities which a state could not abridge were only that limited class which depended immediately upon the constitution of the United States. They are few in number, and of little importance to the great mass of the colored race in their present condition. The right to pass from state to state and to the national capital, to protection upon the high seas and in foreign countries, and a few others, were stated as illustrations. The great body of our civil and political rights, that of acquiring and enjoying property, real and personal, to exercise trades, attend schools and churches, to be protected against personal violence, and enjoy the freedom of opinion, were declared to rest entirely under state protection, and were not included in this amendment.

In reference to the first proposition, that the power of congress was not called into action under this clause until the state, through its political power, had violated its provisions by passing or attempting to enforce some law, obtained the unanimous consent of every member of the court. We do not understand that this is anywhere questioned. This legislation, therefore, when no such exigency has occurred, is without authority, and it is our duty, for this reason, to advise you not to find an indictment for a violation of its provisions.

The second proposition, affirmed by a majority of the court, just as conclusively establishes the invalidity of this law. The character of the wrong done—that of excluding a citizen from an hotel and a theater—is not such as congress has any right to punish. They, say the supreme court, are violations of such rights as attach to citizens of a state, and do not belong to those which he enjoys as a citizen of the United States. It is this latter limited class of rights only which the fourteenth amendment protects. Within this judgment, therefore, there is no power of federal legislation to provide penalties for the violation of any privilege save the few which are enjoyed peculiarly under the federal constitution. The right to go from state to state, to visit the capital, and other national privileges, congress may protect. All others, among which are the rights claimed to have been infringed in the present instance, are beyond its control. For this additional reason the law which attempts to protect them is void for the want of power in the body which passed it. The Slaughterhouse Cases [supra] were well calculated to have elicited a different judgment, if the court had not felt constrained upon principle to decide it as it did. A state law had substantially interfered with the trade and calling of a large class of citizens. Every butcher and dealer in meats over a widespread territory was compelled to pay an onerous tribute to a single corporation. But their right to carry on a trade, to acquire and dispose of property, was held not to come within the protection of the fourteenth amendment. There was no middle ground for the court. They must hold either that it completely revolutionized the whole theory of our government, and transferred to federal control all those rights hitherto alone protected by state laws, or hold, upon the other hand, that it referred only to the few privileges secured by the national constitution. That court in the same volume applied the same principle where a woman in Illinois was rejected as an applicant for admission to the bar. It again decided that such right was not one of the immunities protected by the amendment. In [Bartemeyer v. Iowa] 18 Wall. [85 U. S.] 129, a state law having deprived a citizen of the right to sell what he owned and possessed, it held that the selling of property was a privilege and immunity protected by state laws and constitutions only, and was not protected by this clause. With the fact that this interpretation was equivalent to expunging it from the amendments altogether we have nothing to do. It is true, unquestionably, that any violation of any privilege or immunity protected by the federal constitution, by the state, could be punished and redressed by congressional law before the adoption of this amendment. As now judicially read by the court of last resort, it leaves the organic law in this regard precisely where it was before. It is one of those constructions, often resorted to, to prevent consequences serious and revolutionary, which courts believe were not contemplated by legislatures who pass laws, and by the people who adopt constitutions.

We do not deem it indelicate to express our sympathy with that large and respectable class of our fellow citizens, including beyond question a majority of the more conservative Christian gentlemen of the South, who regret that there exists nowhere, in either government, state or national, the power of punishing those mean and cowardly murders which are so frequently disgracing our civilization before the world. Although we have carried the doctrine of local government in township and county organizations to a great extreme, we find in all its ordinary administrations most beneficial effects. To its universal application, however, most statesmen now agree there should be some exceptions. In no country but our own is the discreditable fact true that where murder, and cruel and shocking outrages, are perpetrated by a dominant party in a narrow region of country, there is no power of punishment, save through the impracticable instrumentality of those who have either committed or sympathized with the crime. When conspiracies and combinations against the property, well-being, and life of classes of persons in the small divisions of our country include large portions of the constabulary, the magis-

tracy, and the jurors, grand and traverse, the inevitable consequence must be that the offenses they commit, or with which they sympathize, will be perpetrated with impunity. Unless our statesmen, state or national, create some jurisdiction of wider scope, and which will authorize indictments and trial beyond the narrow limits a majority of whose citizens abet the crime to be punished, the nation must still submit to the disgrace of yearly additions of mean and courage-wanting murders of the innocent and the helpless, without the slightest infliction of any legal penalty upon the offenders. It has been our painful duty in repeated instances to charge juries that the federal court had no cognizance of offenses where crimes so cruel and shocking have been proved that court, jury, and audience could scarcely refrain from tears of sympathy, and where the elegantly dressed, socially well-connected, and shameless murderers had, in the communities where they had shed innocent blood, not only confessed but boasted of their crimes, and who had either not been indicted at all, or, when tried, had been acquitted by juries, their coadjutors in crime, amid the acclamations of their co-conspirators. In a very recent case it was proved that a young man of wealth, education, and most estimable moral character was shot to death at midday in his own house by a band of ruffians, for no other reason than that he had acted as the chairman of a committee to wait upon the governor of his state to solicit his action for the protection of the negroes of his county who were being driven from their homes, their houses burned, and themselves murdered by the lawless conspirators by whom he was killed. The mock trial by which these infamous offenders were triumphantly acquitted was a still greater stain upon our civilization than the monstrous crime it affected to try. It is believed by many of our best citizens that there should be here, as in every other government on earth, some power to bring such wicked men to justice, outside of, and uncontrolled by, the wills and hands which have united in their atrocities. As it does not now exist, and as no attempt at alteration is made by the state powers, it is natural that all those whose hearts are not of flint, and hope to be blessed and prosper as they do unto others so they would that others should do unto them, should strive to the uttermost to find the source of protection in the federal constitution. In the present condition of public opinion the remedy should, perhaps, be sought through the political action of the state only. I have but small sympathy with the right of the negro to see the immodest and vulgar display in the ballet dance, which in modern times so universally disgraces the best theatrical presentations. I would have selected some more precious and beneficent privilege for protection, if the power had existed. We turn from this almost grotesque exercise of national authority, and express our regret only that it cannot be exerted to protect from pillage and murder the humble homes of those peaceful toilers who quietly and inoffensively labor to support their wives and little ones, and who do not officiously and distastefully thrust themselves in the face of those lighter and less reflective portions of society so frequently found among theatrical audiences. We believe the actual history of this unhappy question demonstrates that, where no legal force or constraint is used, the lady and gentleman of solid position and real cultivation are least annoyed by his presence when he is really worthy and cultivated; that, when left unstimulated by foreign and wicked influences, his own good sense, guided by public opinion, keeps him in his proper position as uniformly as all other classes of society.

A recent judgment of one of the learned justices of the supreme court, after enjoying the benefits of the elaborate arguments, and participating in the dissenting opinions in the Slaughterhouse Cases, still affirms that violence upon the negro, simply because he is such, finding its sole animus in his race and color, may be made penal by congressional enactment. This utterance suggests, what otherwise we should have deemed impossible, that the supreme court may still find in the thirteenth amendment, which abolishes slavery, or the first clause in the fourteenth, which creates citizenship, so much incidental power to protect what they create, as will sustain a national law punishing the crime, where life, liberty, and property are violently taken, solely on account of the race and color of the party injured. Our sympathies are in that direction. Could we see a plausible path, leading to such ground, after what that court has said, we would gladly stand upon it. But so demonstrative appears to us the arguments, in view of the judgments of the supreme court already rendered, that a crime perpetrated by one citizen of Tennessee upon another, when it consists in the violation of some right which is enjoyed solely as the citizen of the state, and depends in no degree upon the national constitution, that we feel at liberty to give no different advice.